IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: Appeal of General Asphalt Paving Company of Philadelphia, Inc. | : | CASES CONSOLIDATED |
| | : | |
| | : | |
| Appeal of: General Asphalt Paving Company of Philadelphia, Inc. | : | No. 1639 C.D. 2024 |
| | : | |
| | : | |
| In re: Appeal of Empire Supplies and Services, LLC | : | |
| | : | |
| | : | |
| Appeal of: Empire Supplies and Services, LLC. | : | No. 1640 C.D. 2024 |
| | : | Submitted: March 3, 2026 |

BEFORE:     HONORABLE MICHAEL H. WOJCIK, Judge
            HONORABLE CHRISTINE FIZZANO CANNON, Judge
            HONORABLE MATTHEW S. WOLF, Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON                          FILED: April 7, 2026


In these consolidated cases, General Asphalt Paving Company of Philadelphia, Inc. (GAP) and Empire Supplies and Services, LLC (Empire) (jointly Appellants) appeal from an order of the Court of Common Pleas of Philadelphia County (Common Pleas) affirming final determinations of the City of Philadelphia (City) Procurement Department (Procurement) that debarred Appellants from City contract eligibility, based on violations of City contract terms and conditions pertaining to the City's antidiscrimination policy. Specifically, Procurement found that while Empire, a minority owned company, was contracted as a subcontractor on certain City contracts, Empire was not actually performing any commercially usable function for purposes of qualification as a Minority Business Enterprise (MBE), but was only a pass-through for GAP. Upon review, we affirm Common Pleas' order.

## I. Background

The City has a program to support Philadelphia businesses that have been certified and designated as, *inter alia*, MBEs in participating in City contracts. *In re: Appeal of Gen. Asphalt Paving Co. of Phila.* (C.P., No. 240102790) & *In re: Appeal of Empire Supplies and Sales, LLC* (C.P., No. 240102906), Pa.R.A.P. 1925(a) Op., filed April 17, 2025) (1925 Opinion) at 1. The City's Executive Order 1-21 (Order 1-21) defines an MBE as

> [a] for-profit business certified by a Third-Party Certifying Agency, that is:
>
> • A sole proprietorship owned and controlled by a Minority Person; or
>
> • A partnership controlled by one or more Minority Persons in which at least 51 percent of the beneficial ownership interests are owned by one or more Minority Persons; or
>
> • A corporation or other entity controlled by one or more Minority Persons in which at least 51 percent of the beneficial ownership interests in such corporation or entity are owned by one or more Minority Persons.

Reproduced Record (R.R.)[1] at 8a n.2. The program requires that the MBE subcontractor perform a "commercially useful function" in order for the prime contractor to claim an MBE contribution to a given contract. *Id.* at 9a & 10a n.7; *see also* 1925 Opinion at 2.

GAP is a family-owned business with two principals. In re: General Asphalt and Paving Services of Philadelphia, Inc. and Empire Supplies and Services,

---

[1] As Appellants' briefs and reproduced records in the two related matters are substantively identical and the cases have been consolidated, we refer to the briefs and reproduced records herein as one brief and reproduced record and cite to the page numbers in the GAP brief and reproduced record for convenience.

LLC (Procurement, OIG File No. 20-00005-1, Controller File No. 19-0218, December 28, 2023) (Procurement Decision)[2] at 9. Empire is a limited liability company with three owners. *Id.* at 10. George Wallace, a minority individual, holds a 51% interest in Empire; the two principals of GAP hold the remaining 49% in equal shares. *Id.* Empire operates out of GAP's office, and the only three individuals identified as ostensible Empire employees are on GAP's payroll. *Id.*

Empire became certified and designated as an MBE in January 2018. R.R. at 14a. Empire thereafter obtained subcontracts on certain City contracts, those subcontracts having been awarded on the basis of Empire's MBE status so as to allow the contractors to exploit advantages available from the City for MBEs under Order 1-21. *See id.* at 13a-14a. Empire, which lacked the capacity to perform the subcontracts, in turn subcontracted the awarded work to GAP. *Id.* at 3a.

In 2019, after receiving complaints questioning the propriety of Empire's MBE status, the City's Office of the Controller (Controller) and Office of the Inspector General (Inspector General) conducted a joint investigation of Empire. 1925 Opinion at 2. In November 2021, the Controller and the Inspector General issued a joint investigative report concluding that Empire violated a City policy by giving the appearance of performing a commercially useful function on a subcontract when, in fact, Empire performed no such commercially useful function. *Id.* Specifically, the investigation by the Controller and the Inspector General led them to conclude that "Empire acted as a pass-through for GAP, subcontracting Empire's own work to GAP while Empire invoiced for the work GAP performed and claiming MBE participation for GAP's work." R.R. at 3a. The report recommended that Procurement initiate proceedings to impose sanctions against

---

[2] The Procurement Decision is Appendix A to Appellants' Brief.

Appellants under the City's Policy and Procedure for the Debarment and Suspension of Vendors and Contractors (Debarment Policy). *Id.* at 4a; *see also* 1925 Opinion at 2.

In January 2022, Procurement issued a Notice of Intent to Debar to Appellants and their principals under sections of the Debarment Policy related to false or deceptive statements, improper billing, and dishonest conduct. R.R. at 1a-4a; *see also* 1925 Opinion at 2. In September 2023, hearings were held under the Local Agency Law[3] before a three-member hearing panel representing Procurement. 1925 Opinion at 2. In December 2023, the hearing panel issued written decisions that included findings of fact and conclusions of law and imposed sanctions including debarment of Appellants for three years. Procurement Decision; *see also* 1925 Opinion at 2.

Appellants filed statutory appeals to Common Pleas, which affirmed Procurement's decisions. 1925 Opinion at 3. Appellants then appealed to this Court.

## II. Issues

Appellants raise two issues on appeal.[4] The first is a legal argument in which Appellants assert that the hearing panel applied an improper burden of proof by requiring Appellants to demonstrate that no basis for debarment existed rather than merely requiring the City to prove its case by a preponderance of the evidence.

---

[3] 2 Pa.C.S. §§ 105, 551-555 & 751-754.

[4] In a procurement debarment case, "[t]his Court's review is limited to determining whether constitutional rights were violated, whether an error of law was committed or whether necessary findings of fact are supported by substantial evidence." *Boss Insulation & Roofing v. Dep't of Lab. & Indus.*, 722 A.2d 778, 780 n.3 (Pa. Cmwlth. 1999) (citing *Pa. Prevailing Wage Appeals Bd. v. Steve Black Inc.*, 365 A.2d 685 (Pa. Cmwlth. 1976)).

The second is a collection of factual arguments essentially challenging the weight of the evidence. We address each issue in turn.

## III. Discussion

## A. Burden of Proof

In their first argument, Appellants point to the Procurement hearing panel's conclusions of law stating that Appellants failed "to show that no basis for the intended debarment exist[ed]." Br. of Appellants at 22-23; Procurement Decision at 36. Appellants insist this constituted the application of an incorrect and impossible burden of proof. We discern no merit in this argument.

The Procurement Decision expressly recognized that "the City had the initial burden of proof, was required to establish that a basis for debarment exists, and that the basis is established by a preponderance of the evidence." Procurement Decision at 35; *see* 62 P.S. § 531(a) (providing that a "decision to debar shall be based upon substantial evidence that a cause for debarment or suspension . . . has occurred"). Procurement went on to explain that, "[h]aving found that the City met its burden, [Appellants,] the parties challenging the intended debarment, . . . then had the burden to show that no basis for the intended debarment exists . . . . [Appellants] failed to meet their burden." *Id.* at 35-36. Thus, Procurement correctly first required the City to prove a basis for debarment by a preponderance of the evidence. *Id.* at 35; *see* 67 Pa. Code § 491.10(b) (providing that "[t]he party with the burden of proof in a proceeding will proceed first with the presentation of evidence at a hearing"). Procurement found that the City met that burden. *Id.* Only then did Procurement shift the burden to Appellants to rebut the City's demonstrated basis for debarment, a burden Procurement found Appellants failed to meet. *Id.* at

5

35-36. Notably, Procurement was only required to allow Appellants to be heard and to "take into consideration the seriousness of any violation and any mitigating factors" offered by Appellants in response to the City's presentation of its case. 62 P.S. § 531. We, therefore, discern no error in Procurement's application of the burden of proof.

## B. Weight of the Evidence

As noted above, this Court is bound by findings of fact in a debarment matter, provided that those findings are supported by substantial evidence. *Boss Insulation & Roofing v. Dep't of Lab. & Indus.*, 722 A.2d 778, 780 n.3 (Pa. Cmwlth. 1999) (citing *Pa. Prevailing Wage Appeals Bd. v. Steve Black Inc.*, 365 A.2d 685 (Pa. Cmwlth. 1976)). "[S]ubstantial evidence [is] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Kneebone v. Zoning Hearing Bd. of the Twp. of Plainfield*, 273 A.3d 553, 564 (Pa. 2022) (quoting *Valley View Civic Ass'n v. Zoning Bd. of Adjustment*, 462 A.2d 637, 640 (Pa. 1983)). Notably, in determining whether findings are supported by substantial evidence, the relevant inquiry is not whether evidence exists to support different findings, but whether substantial evidence exists to support the findings actually made. *DTE Energy Co. v. Workers' Comp. Appeal Bd. (Weatherby)*, 245 A.3d 413, 421 (Pa. Cmwlth. 2021); *Raya & Haig Hair Salon v. Pa. Human Rels. Comm'n*, 915 A.2d 728, 732 (Pa. Cmwlth. 2007). It is solely for the fact finder to judge the credibility of witnesses and to weigh the evidence; such matters are not within the scope of this Court's appellate review. *Raya & Haig*, 915 A.2d at 732. Further, "[t]he Court must view the evidence in a light most favorable to the party that prevailed before the factfinder." *DTE Energy*, 245 A.3d at 421.

6

Here, Appellants raise several arguments suggesting, in essence, that the hearing panel rendered a decision that was against the weight of the evidence. Applying the limited review set forth above, we reject all such arguments.

First, Appellants assert that there was not substantial[5] evidence to support Procurement's determination that Empire was a "front" or "pass-through" for GAP. Br. of Appellants at 30-32. To the contrary, the record contains ample evidence that Empire subcontracted its work on its City subcontracts to GAP and then submitted invoices and purchase orders representing that Empire itself had done the work. *See, e.g.*, R.R. at 2986a-90a, 3696-3705a; *see also* Procurement Decision at 11-20 & 24-29.

Appellants relatedly suggest that the "pass-through" determination was irrelevant because "there is and was no prohibition against such a business arrangement . . . " and, moreover, that "this ['pass-through'] label was surely defeated by the extensive evidence, including Empire's operational, management, and business document that all confirmed [George] Wallace's independence and control." Br. of Appellants at 30-32. As a legal argument, this assertion ignores the requirement of Order 1-21 that an MBE, to perform a commercially useful function and thereby qualify for the minority benefits of participating in a City contract, must self-perform at least 20% of the services for which it has been contracted.[6] *See* Order 1-21. Factually, as set forth above, the record contains substantial evidence that Empire performed no work at all, but rather, passed through the entirety of the contracted work to GAP. *See, e.g.*, R.R. at 23a (investigation results indicating that

---

[5] Appellants actually characterize their assertion as a lack of "substantive" evidence. Br. of Appellants at 30. We assume that word choice was inadvertent, and we address Appellants' argument based on the substantial evidence standard.

[6] The relevant portion of Order 1-21 is set forth at length below.

"Empire has invoiced GAP for materials and hauling, which were then billed to the City" and that a GAP principal and Empire minority interest holder "admitted to investigators during his interview that he has occasionally called material distributors directly and told them that the materials are intended for GAP and the purchase is merely being passed through Empire"). Whether there was also contrary evidence is irrelevant. *See DTE*, 245 A.3d at 421; *Raya & Haig*, 915 A.2d at 732. Viewing the evidence in the light most favorable to the City as the prevailing party below, *see DTE*, 245 A.3d at 421, we conclude that Common Pleas did not err in affirming the Procurement Decision.

Next, and relatedly, Appellants observe that two specified City project contracts, performance of which led to the violations resulting in Appellants' debarments, were not introduced into evidence. Br. of Appellants at 32-33. Appellants contend that without the inclusion of the contracts in the record, the hearing panel could not reasonably "render any finding of fact or conclusion of law that Empire or GAP violated any minority participation regulation or standard with respect to these City projects." *Id.* at 33. In fact, Appellants argue, one of the contracts did not include a minority participation requirement. *Id.* at 34. Further, according to Appellants, the project contracts "do not include [] 'commercially useful function' requirements or provisions . . . ." *Id.* at 35. Appellants insist the hearing panel "rendered a determination on and using evidence that was simply wrong, erroneous, and false, as well as the product of poor investigation." *Id.* at 38. However, the hearing panel found as a fact that an MBE must perform a "commercially useful function" in order for the advantages of the City's MBE policy to inhere. Panel Decision at 8; *see also* Order 1-21 (requiring bidders to identify only those MBEs performing commercially useful functions). Empire's majority

8

owner acknowledged as much. *Id.* at 26. Order 1-21 itself defines a "commercially useful function" by stating, in pertinent part:

> For contractors and subcontractors, an [MBE] performs a Commercially Useful Function when it performs a distinct element of a City Contract (as required by the work to be performed in accordance with the bid specifications) which is worthy of the dollar amount of the [MBE]'s contract and the [MBE] carries out its responsibilities by managing and supervising the work involved and actually self-performing at least twenty percent (20%) of the work of the contract with its own workforce. For suppliers, an [MBE] performs a Commercially Useful Function when it is responsible for sourcing the material, negotiating price, determining quality and quantity, ordering the material, and paying for it from its own funds. Commercial usefulness will be evaluated and determined by the OEO on a bid-by-bid basis as informed by prevailing industry standards and the [MBE]'s NAIC Codes and may require, without limitation, evidence of a warehouse, distribution equipment, and certified payroll records.

Order 1-21. Thus, there was no need for a contract term requiring that a minority subcontractor perform a commercially useful function because that requirement was inherent in Order 1-21's prerequisites for MBE advantages in seeking City contracts.

Finally, Appellants point to a plumbing and heating repair contract between GAP and the City for which Empire ostensibly rented equipment to GAP. Appellants insist they presented substantial unrebutted evidence that the City was incorrect in concluding that GAP was essentially renting its own equipment and improperly sought minority participation credit in connection with the transactions. *See* Br. of Appellants at 39. Appellants likewise maintain that the City did not fully investigate or adequately explain its assertion that Appellants engaged in "circular billing" practices regarding their contractual interactions; Appellants insist Empire's accountant found "no discrepancy or issue . . . ." *Id.* at 49-51. However, these are

9

factual issues that were determined by Procurement adversely to Appellants. As previously explained, the question before this Court is not whether there was evidence contrary to the findings made by Procurement, but only whether, viewing the evidence in favor of the City as the prevailing party, there was substantial evidence in support of the findings Procurement actually made. *See DTE*, 245 A.3d at 421; *Raya & Haig*, 915 A.2d at 732. Here, the record contains substantial evidence, detailed at length by Procurement, of the circular billing practices in which Empire engaged with GAP related to the plumbing and heating contract. GAP and Empire acknowledge that they "worked together and billed back and forth, which technically can be labeled 'circular billing,'" but that this was "just a label." Br. of Appellants at 17. However, Procurement found, based on record documents and testimony, that Empire billed GAP for rental of backhoes, although GAP already owned some 50 backhoes and Empire did not own any backhoes. R.R. at 23a; Procurement Decision at 14-17 & 19-20. Further, Empire billed GAP for work for which GAP claimed MBE credit but which Empire did not perform and was not even licensed to self-perform; instead, record evidence indicated GAP actually performed the work. Procurement Decision at 17-18, 22 & 24. Accordingly, we discern no error in Common Pleas' affirmation of this aspect of the Procurement Decision.

## IV. Conclusion

Based on the foregoing discussion, we affirm Common Pleas' order.

_____
CHRISTINE FIZZANO CANNON, Judge

10

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: Appeal of General Asphalt Paving Company of Philadelphia, Inc. | : | CASES CONSOLIDATED |
| | : | |
| | : | |
| Appeal of: General Asphalt Paving Company of Philadelphia, Inc. | : | No. 1639 C.D. 2024 |
| | : | |
| | : | |
| In re: Appeal of Empire Supplies and Services, LLC | : | |
| | : | |
| | : | |
| Appeal of: Empire Supplies and Services, LLC. | : | No. 1640 C.D. 2024 |
| | : | |

# **O R D E R**

AND NOW, this 7th day of April, 2026, the November 6, 2024 order of the Court of Common Pleas of Philadelphia County is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge